UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CYNTHIA SULLIVAN,

      Plaintiff,

      v.

METROPOLITAN LIFE INSURANCE COMPANY, et al.,

      Defendants.

_____/

No. C 09-03718 PJH

**ORDER ON MOTIONS FOR JUDGMENT**

      The parties' cross-motions for judgment came on for hearing before this court on June 29, 2011. All parties appeared through counsel. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS plaintiff's motion for judgment and DENIES defendant's motion for judgment for the reasons set forth below and stated at the hearing.

## BACKGROUND

      This is an ERISA action challenging the denial of payment of long-term disability ("LTD") insurance benefits. Plaintiff Cynthia Sullivan ("plaintiff") was employed as a sales consultant by defendant Home Depot U.S.A. Inc. ("Home Depot") from April 15, 2004 to November 30, 2005. While an employee, plaintiff participated in Home Depot's Long Term Disability Plan (the "Plan"), an ERISA plan issued by defendant Metropolitan Life Insurance Company ("MetLife").

      **A.**    **LTD Benefits Under the Plan**

      The Plan provides monthly LTD benefits to eligible participants, following a 26 week elimination period, if they are "Disabled" under the terms of the Plan. The Plan defines "Disabled" as follows:

> "Disability" or "Disabled" means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:
>
> 1. you are unable to perform each of the material duties of your regular job or any gainful occupation for which you are reasonably qualified taking into account your education, training and experience; or
> 2. you, while unable to perform all of the material duties of your regular job on a full-time basis, are
>    a. performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and
>    b. earning currently at least 20% less per month than your Indexed Basic Monthly Earnings due to that same Injury or Sickness.

Administrative Record ("AR") at 27. The Plan contains a number of limitations, one of which is for "Mental or Nervous Disorders or Diseases." This limitation informs claimants that "You are covered for 24 months of Disability, including Elimination Period(s) during your lifetime if you are Disabled due to . . . [a] Mental or Nervous Disorder or Disease[.]" This limitation contains an exception for bipolar disorder. AR 32.

MetLife issued to Home Depot a group policy of insurance to fund benefits payable under the Plan, and is also the Plan's claims administrator. The Plan confers discretionary authority on MetLife to determine eligibility for benefits:

> **Discretionary Authority of Plan Administrator and Other Plan Fiduciaries**
>
> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

AR 45.

### B. Plaintiff's LTD Claim

Plaintiff's last day of work at Home Depot was November 30, 2005. AR 139. Plaintiff was approved for short term disability benefits and received the maximum amount of benefits under that benefit plan. See AR 583. Based on the 26-week elimination period, plaintiff became eligible for LTD benefits on June 8, 2006. (The "elimination period" is the

1  time period during which a claimant must remain disabled in order to begin receiving
2  benefits. AR 18, 27-29.) In about April 2006, MetLife provided plaintiff with an LTD packet
3  to complete and return if she wanted to pursue an LTD claim under the Plan. AR 301.
4        Plaintiff did not timely submit LTD forms to MetLife. MetLife informed her, by letter
5  dated October 3, 2006, that it was ceasing its review. AR 296-297. In about November
6  2006, plaintiff submitted her claim for LTD benefits, in which she asserted that she was
7  unable to work due to "P.T.S.D. [post traumatic stress disorder], Depression (Bi-polar)
8  maybe other, Hep C [hepatitis C], Renal Cyst, Hypoglycemia, Heart murmur, some High
9  Blood pressure." AR 220, 225-226.
10       By letter dated November 15, 2006 to MetLife, plaintiff reported extreme fatigue,
11 confusion, and panic attacks. AR 273. She stated that she had been in an abusive
12 relationship that ended in late June or early July 2006. Id. Plaintiff also submitted a
13 November 14, 2006, letter from a domestic violence advocacy center. AR 237. The
14 domestic violence advocate reported that plaintiff had left an abusive partner and needed
15 assistance with housing and finances because her abusive partner controlled their
16 finances. Id. Plaintiff and her two teenage boys had been living out of their car, until they
17 were able to secure housing at a family shelter. Id. The advocate further stated that
18 plaintiff's main focus was on keeping herself and her two sons safe from the abusive
19 partner. Id.
20       Plaintiff submitted a letter dated November 2, 2006, from her treating physician, Dr.
21 Adrienne Nicklin. AR 281. Dr. Nicklin stated that Sullivan had been diagnosed with PTSD
22 (diagnosed many years earlier), hepatitis C "with a high viral load that results in fatigue,"
23 and suffered from a "large renal cyst." Dr. Nicklin confirmed that plaintiff was being treated
24 for bipolar disorder which was "not yet optimally controlled," for which she was seeing a
25 psychiatrist, Dr. William Strek. Dr. Nicklin stated that plaintiff "has both physical illnesses
26 that affect her level of energy and function, as well as her mental illnesses[.]" AR 281-82.
27 Plaintiff provided MetLife with notes from office visits with Dr. Nicklin dated October 17, 20
28 and 23, 2006. AR 283-89.

Plaintiff submitted an Initial Functional Assessment form completed by her psychiatrist, Dr. William B. Strek, on November 9, 2006. AR 278-79. Dr. Strek reported that he first saw plaintiff on May 4, 2006 and that her most recent office visit was on October 31, 2006. Id. His primary diagnosis was "296.80," or bipolar disorder, with a secondary diagnosis of "309.81," or PTSD. Dr. Strek stated that plaintiff suffered from "depression, anxiety, anger, sleep disturbances, appetite disturbances, hopeless[ness], anergia, anhedonia, suicidal ideation, paranoia." AR 278. He also informed MetLife that plaintiff was taking Seroquel, an antipsychotic used to treat schizophrenia and bipolar disorder. See AR 841. Dr. Strek opined that plaintiff was "unable to work in a work setting because of intrusive psychiatric symptoms." AR 279. Dr. Strek estimated that plaintiff could return to work by November 17, 2006. AR 278.

MetLife requested that Dr. Strek complete an additional form, which he completed on December 21, 2006. AR 208-09. He reiterated his diagnoses as PTSD and bipolar disorder (not otherwise specified). Dr. Strek informed MetLife that plaintiff had "severe" Axis IV (Psychosocial and Environmental Problems) difficulties. He reported that in March 2006, plaintiff's primary care physician gave her Effexor that made her "crazy and want[] to kill her partner." Dr. Strek also noted that plaintiff "felt like she was having thoughts that were not her own, was having auditory hallucinations + delusions that someone was crawling around in the walls of her home," and opined that plaintiff's ability to work was impaired by "auditory hallucinations & delusions as well as paranoia." AR 208. He had recently prescribed Abilify (an antipsychotic). Id. See doc. no. 29 at 8. Dr. Strek reported a GAF (Global Assessment of Functioning) of 65. AR 208. (MetLife represents that the DSM-IV-TR states that a GAF score between 61-70 indicates: "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships." Doc. no. 27 at 9.) Dr. Strek opined that plaintiff could return to work on January 15, 2007, and noted that plaintiff abused methamphetamines and had been referred to a counselor, Rick Gross. AR 209.

4

Although Dr. Strek completed two claim forms, MetLife contends that Dr. Strek never provided MetLife with any treatment records. Doc. no. 27 at 9. MetLife further contends that it requested records from Mr. Gross, but none were received. Id. at 10.

Following receipt of plaintiff's submission, MetLife conducted a telephonic interview with plaintiff on November 28, 2006. AR 161-64. She stated that stress related panic attacks caused her to leave work. AR 162. She also stated that she was having problems at work and relationship issues, and the stress was overwhelming. Id. She reported her symptoms as "panic attacks and cannot seem to focus and concentrate." AR 163. Plaintiff also stated that she had hepatitis C and kidney problems, which caused her hands and feet to become swollen. AR 163.

By letter dated January 2, 2007, MetLife advised plaintiff that it was denying her claim because she had not submitted sufficient medical information to support it. MetLife pointed out the many requests it made of Dr. Strek and Mr. Gross for records relevant to plaintiff's claimed functional impairment, which received no response. AR 203-04. MetLife noted the absence of a mental status exam, global assessment of functioning, psychiatric evaluation and a current cognitive functioning evaluation, office progress notes, response to medications, treatment plan and symptoms preventing plaintiff from being able to return back to work. AR 204. MetLife also discussed the fact that the medical records that had been provided were based on self-reports only, with no functional assessments or corroborative data. Id. Therefore, MetLife determined that the documentation plaintiff submitted was not sufficient to support a severity of impairment from a global psychiatric disorder.

MetLife further advised plaintiff that on receipt of the requested information, her claim would be reopened and further reviewed. AR 204. She was also fully advised of her ERISA rights to appeal the determination by written request. Id.

**C. Administrative and Procedural History**

Plaintiff purportedly exercised her right to appeal in a May 21, 2007 letter and submitted additional medical records. AR 487. Plaintiff subsequently filed this lawsuit on

5

August 13, 2009 challenging MetLife's denial of LTD benefits. Plaintiff asserts a single claim for relief pursuant to ERISA for wrongfully denied disability benefits due plaintiff and for reinstatement to the Plan.

At the initial case management conference on November 19, 2009, the Court resolved the issue whether plaintiff had exhausted the Plan's administrative remedies by staying the action and remanding the case back to MetLife to conduct the appeal. See doc. no. 16 (Nov. 20, 2009 order). Plaintiff formally resubmitted her appeal on March 31, 2010, with supporting Social Security Administration ("SSA") records, medical records, and letters in support of plaintiff's appeal. AR 582-85.

### 1. Social Security records

Plaintiff's SSA records show that plaintiff filed an application for disability benefits with the SSA on July 21, 2006, alleging disability beginning June 30, 1989. The application was initially denied, but ultimately granted after a hearing before the Administrative Law Judge on August 23, 2007. The ALJ decision, dated August 31, 2007, found that plaintiff was disabled as of July 21, 2006 and awarded supplemental security income ("SSI") benefits. AR 593-600. The ALJ decision made the following findings:

> Non-examining state agency physician Martin Kehrli, M.D., reviewed the evidence of record on October 31, 2006, and concluded that the claimant did not have any limiting physical medically determinable impairment. He noted that although she is positive for hepatitis C, she is not symptomatic and not on any treatment for hepatitis C. He concluded that her alleged heart problem is actually either a symptom of anxiety or a symptom of her methamphetamine abuse. Accordingly she was not found to have severe physical impairments. Non-examining state agency physician May Ann Westfall, M.D., reviewed the evidence of record on March 1, 2007, and affirmed the conclusions of Dr. Kehrli.
>
> Non-examining state agency psychologist Paul Rethinger, PhD., reviewed the evidence of record on December 13, 2006, and concluded that since July 17, 2006, the claimant had severe psychological impairments in the nature of an affective disorder (depression/bipolar), an anxiety disorder (post traumatic stress disorder/generalized anxiety disorder/panic disorder), and a substance abuse disorder. Psychologist Rethinger noted that the claimant had an episode of paranoia in March of 2006, and on May 25, 2006, Dr. Strek mentioned in his chart notes that he had written a letter on the claimant's behalf that he was giving no weight to this opinion of Dr. Strek because he had not provided sufficient rationale

> for his conclusion and had not provided a timeframe. Psychologist Rethinger concluded that the claimant's psychological impairments created mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration/persistence/pace, and no episodes of decompensation.
>
> Subsequent reporting by Dr. William Strek indicates that the claimant is chronically irritable and has mood instability. On October 31, 2006, this doctor noted the claimant is "reluctant to try any medications as she feels her emotional state is quite reasonable as she still feels she was being poisoned by her ex-partner." Reporting in the medical record dated August 3, 2007, noted that the claimant had come into the emergency room department with paranoid thinking, anger appearing at a police station with a gun. She tested positive for methamphetamine.

AR 596.

The ALJ found that plaintiff had a "severe combination of impairments," including "affective disorder (depression/bipolar, with delusions)" and "an anxiety disorder (post traumatic stress disorder/generalized anxiety disorder/panic disorder)[.]" AR 596. The ALJ noted that the "medical record documents several episodes of the claimant losing touch with reality." AR 597. As a result, she suffered from "marked difficulties in maintaining concentration, persistence or pace." AR 597. The ALJ also found that plaintiff could not "perform at a consistent pace without an unreasonable number and length of rest periods or absences, even if working in a sedentary capacity," and that she would "miss more than 2 days of work per month due to her medical impairments." AR 597. As a result, the ALJ ruled that, exclusive of substance abuse, "there are no jobs that exist in significant numbers in the national economy that the claimant can perform," and therefore plaintiff was entitled to disability benefits. AR 598-99.

### 2. Medical records

Plaintiff submitted records of Dr. Anna Hejinian, who treated plaintiff from November 3, 2005. AR 734-36. Dr. Hejinian informed MetLife that she had been treating plaintiff for depression, anxiety, and panic attacks. Dr. Hejinian also informed MetLife that plaintiff had tried a host of different drugs in an effort to counter those symptoms, including Zoloft (for depression/anxiety/panic attacks), Buspar and Lorazepam (for anxiety), Effexor (for

depression), and Clonazepam (for panic attacks).   Dr. Hejinian stated that Ms. Sullivan could not work due to anxiety, nausea, insomnia, and "disabling depression," and that Ms. Sullivan was tearful and anxious, and had a history of depression and PTSD.  Dr. Hejinian stated that she had confirmed through "presentation in office" plaintiff's constant crying, nausea, and panic attacks.  AR 734-35.

Plaintiff also submitted records of Dr. Strek and Dr. Nicklin.  The medical records indicated that plaintiff had had "a nervous breakdown;" she felt like she "was hearing thoughts that didn't belong to me" and "heard sounds like someone crawling in the attic." AR 651-52.  She also thought her partner had hidden things in the toilet and was trying to poison her, AR 653, as well as place tracking devices on her AR 720.  Plaintiff also "had suicidal thoughts," "rapid cycling" of her bipolar condition, and "panic attacks every day." AR 818.  At times her thought process was "incoherent" and "illogical" (1188), and her concentration "poor."  AR 1192.  She expressed "delusional thoughts" about being stalked, including finding "wet footsteps on the patio" and seeing the "image" of her partner "in bushes around her house."  AR 1200.  She stated that the police "were prejudiced against her," AR 1202, but that she would "get to the bottom of this," AR 1200.

The records show that plaintiff received emergency treatment on at least two occasions for psychotic symptoms: on August 21, 2006, AR 840-43, and on July 28, 2007, AR 953.  The 2007 hospitalization was the result of plaintiff walking into a police department with a loaded gun "thinking someone was after her" and "putting substances in her food."  AR 1122, 1188.  Plaintiff acknowledged that some of what she said "may sound crazy" but according to her physician, "she truly feels that they are so and worked out some ways that they could be true and is continuing to pursue this."  AR 953-54.

### 3. Supporting letters

Plaintiff also submitted letters from her son, Bret, and a friend, Christa Turnell.  Bret informed MetLife that prior to her illness his mother had been active in the community, involved in her education and the education of her children, and was a top-ranking salesperson with Home Depot.  Due to her illness, however, "it's almost like she has

8

become a completely different person." He explained that his mother had become introverted, paranoid, fearful, and "unable to handle simple complications in her everyday dealings." He stated that she "almost never leaves the house," has "vivid hallucinations," and as a result, he handled most of her "dealings with the outside world." AR 907.

Ms. Turnell, an attorney, stated that she had known plaintiff since 2000, and that in 2005 she "saw that something was going seriously wrong for her." Plaintiff was "anxiety ridden," stayed in her house, "cannot concentrate to read," and had become extremely disorganized, whereas before she had been very organized. She noticed plaintiff had "lost her ability to file, keep track of dates, and appointments." In short, "This is not the Cynthia I knew five years ago." AR 908-09.

### 4. MetLife's Review and Denial of Appeal

As part of the appeal investigation, MetLife obtained two Independent Physician Consultant ("IPC") reviews. MetLife referred plaintiff's file for review by in-house psychiatrist Dr. Ernest Gosline, who completed his report on June 23, 2010. AR 477-81. Dr. Gosline admitted that the medical documentation "includes a family history and personal history possibly consistent with Bipolar Disorder." AR 479. He conceded that records showed her psychiatric condition was "worsening." AR 480. However, Dr. Gosline concluded that the "information available for review fails to provide compelling evidence that would support a consistent global impairment of function" during the relevant time period. Id. Dr. Gosline was unable to speak with Dr. Strek, but he did speak with plaintiff's therapist, Rick Gross, who informed MetLife that plaintiff feared for her safety due to a dangerous relationship with her former partner, and that she suffered from hallucinations, which he "took at face value." Mr. Gross deferred to Dr. Strek for making a "definitive disability statement," but he did state that plaintiff "would have been unable to focus on her job in view of the symptoms of severe anxiety and fear of bodily harm (realistic or not)." AR 478-79.

MetLife also commissioned a report from Dr. Joseph L. Rea, Board certified in occupational medicine, who reviewed plaintiff's medical records and concluded in a May

12, 2010 report that plaintiff was not disabled from a physical standpoint. AR 453-57. In conducting his review, Dr. Rea spoke with Dr. Nicklin (plaintiff's family physician). Dr. Nicklin indicated that plaintiff would probably need something more objective to determine her disability, but stated she could not discuss her patient further without getting permission from plaintiff. Dr. Nicklin stated that she would call plaintiff and obtain permission; Dr. Rea tried to reach Dr. Nicklin again, but was unable to do so. AR 456. Dr. Rea opined that the medical records did not support physical functional limitations as of December 8, 2005, through June 8, 2006, and beyond. Dr. Rea found that plaintiff's renal cyst had been drained and was being monitored, and there was no evidence that plaintiff had been compromised by the cyst. Dr. Rea also found that plaintiff's hepatitis C was discovered in 1998, and that there was no significant change in later lab results to show that this was causing any functional impairment. Dr. Rea did not find any evidence that plaintiff's medications for these conditions were causing any impairment. AR 457.

     MetLife denied plaintiff's appeal in a letter dated August 24, 2010. AR 397-401. MetLife conceded that plaintiff's medical records were "possibly consistent with bipolar disorder." AR 400. MetLife also conceded that plaintiff "suffered from self-reported variations in daily performance of activities of daily living, periodic mood swings, the threat of possible danger from a former spouse, and changes in medication that might have interfered episodically with Ms. Sullivan's ability to work full time at her own job." AR 400. However, MetLife concluded that "there is insufficient clinical medical evidence provided in our file that would support that her conditions were at a severity and causing functional limitations that would prevent Ms. Sullivan from performing her own job as of June 8, 2006." AR 401. With respect to the ALJ's findings that plaintiff was disabled and entitled to Social Security benefits, MetLife contended that the ALJ's "determination is separate from and governed by different standards than MetLife's review and determination pursuant to the terms of the Plan." AR 401.

     The court held a further case management conference on September 16, 2010. Plaintiff and defendants cross-move for judgment pursuant to FRCP 52.

**DISCUSSION**

**A.     Standard of Review**

When a Plan administrator's denial of benefits is challenged under ERISA, the default rule holds that court review of the administrator's denial is de novo, unless the benefit Plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (en banc). In this situation, review will occur under an abuse of discretion standard. Analysis of the issue depends on the wording of the Plan itself. The Ninth Circuit in Abatie held that "for a Plan to alter the standard of review from the default of de novo to the more lenient abuse of discretion, the Plan must unambiguously provide discretion to the administrator." See id. at 964.

Here, the Plan undisputedly confers discretionary authority on MetLife. AR 45. The denial is therefore reviewed for abuse of discretion. See doc. no. 29 at 13. As the Supreme Court has stated, "Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits. It means only that the plan administrator's interpretation of the plan "'will not be disturbed if reasonable.'" Conkright v. Frommert, 130 S.Ct. 1640, 1651 (2010) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989)).

MetLife concedes that it acts as both the payor and the claim administrator of the ERISA plan, thereby presenting a structural conflict of interest. See doc. no. 30 at 13. The Supreme Court has held that "[i]n the face of a conflict of interest, the standard of review remains abuse of discretion, but the analysis changes slightly." Conkright, 130 S.Ct. at 1646. The court must weigh evidence of a conflict as a "factor in determining whether there is an abuse of discretion." Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 115 (2008) (citations omitted). "When reviewing denials by administrators, the court is 'to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together.'" Id. at 117.

Where, as here, the plan gives the administrator discretion and the administrator has a conflict of interest, the court must review the administrator's decision to deny benefits to evaluate whether it is reasonable. Salomaa v. Honda Long Term Disability Plan, --- F.3d ----, 2011 WL 2040934, *8 (9th Cir. May 26, 2011). Following Conkright and Glenn, the Ninth Circuit established the test for abuse of discretion in the ERISA context to require review for whether the administrator's decision was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record," subject to "the qualification that a higher degree of skepticism is appropriate where the administrator has a conflict of interest." Id.

**B.  Analysis**

Based on this court's review of the administrative record, and considering relevant factors, the court determines that it was unreasonable for MetLife to deny LTD benefits.

**1.  Medical records**

One factor that the court may consider is MetLife's decision to conduct a "pure paper" review of plaintiff's claim, rather than conducting an in-person medical evaluation. Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 633 (9th Cir. 2009) (as amended). Although the Plan does not require an independent medical exam, AR 35, the decision to review plaintiff's medical files rather than conduct an independent examination "'raises questions about the thoroughness and accuracy of the benefits determination.'" Id. (quoting Bennett v. Kemper Nat'l Servs., Inc., 514 F.3d 547, 554 (6th Cir. 2008)). Neither Dr. Gosline nor Dr. Rea examined plaintiff.

MetLife contends that plaintiff failed to provide substantial evidence of functional impairment during the elimination period, November 30, 2005 to June 8, 2005, or beyond. MetLife does not dispute that plaintiff had several diagnoses, but contends that her medical conditions did not result in restrictions and limitations sufficient to render her disabled under the Plan. Doc. no. 18-19. MetLife contends that plaintiff had been diagnosed with her conditions for many years prior to her claim, but that the diagnoses did not in themselves prevent her from working. Id. at 19. Rather, MetLife contends, the evidence shows that

her inability to focus and continue working was caused by the escalation of her abusive relationship that led her to fear for her safety and that of her children.  Id.

MetLife argues that the minimal medical evidence submitted by plaintiff and her physicians fail to establish that plaintiff was functionally impaired from performing her occupation, thereby failing to establish eligibility for LTD benefits under the Plan.  Dr. Rea opined that plaintiff's medical records did not support physical functional limitations or limitations due to medication effects as of December 8, 2005.  AR 456-57.  More importantly, Dr. Gosline opined that the medical information did not support restrictions and limitations based on global impairment of function related to the psychiatric diagnosis, rather than the situational stressors caused by her abusive partner.  AR 479.  Dr. Gosline concluded that plaintiff's medical information did not document "conclusive functional impairment after 12/08/05" based on a psychiatric diagnosis.  AR 480.

Dr. Gosline's report acknowledged evidence in the record of "self-reported variations in daily performance of ADLs, periodic mood swings, the threat of possible danger from former spouse, and changes in medication that might have interfered episodically with claimant's ability to work full time at own job."  AR 480.  Dr. Gosline focused on plaintiff's "preoccupation with safety" as a "personal choice over the responsibilities in the workplace," but did not discuss or distinguish the diagnoses in the record evidencing plaintiff's psychiatric disorders.  Dr. Gosline notes that "[s]ome references are made to 'hallucinations,' but the nature of these hallucinations is not clarified in terms of an appropriate diagnosis."  AR 478.  This conclusion suggests a failure by Dr. Gosline to consider whether the hallucinations were caused by plaintiff's well-documented diagnosis of bipolar disorder.  At most, Dr. Gosline's report acknowledges "a family history and personal history, possibly consistent with Bipolar Disorder."  AR 479.  Dr. Gosline's report opines that "[t]he question of the degree of psychotic symptomatology does not appear supported by the medical evidence," AR 479, yet the report fails to address the following records of psychiatric diagnoses:

13

(1) Dr. Hejinian's office records, which plaintiff submitted to MetLife in conjunction with her appeal, which document plaintiff's diagnoses of anxiety, depression, nausea, and panic attacks, from November 2005 to February 2006 :

- On November 3, 2005, Ms. Sullivan was treated for "acute," "chronic" anxiety which "interefer[ed] with her function at work and in her daily activities." AR 743.
- On November 7, 2005, Ms. Sullivan was treated for "acute anxiety and PTSD." AR 742.
- Ms. Sullivan reported that "she has never had anxiety as bad as this before," was having panic attacks, and "never had this interfere with work before." She also felt "very strange and 'outside of myself.'" AR 743.
- On November 23, 2005, Ms. Sullivan reported "chronic nausea associated with her stress and anxiety" which "has clearly worsened over the past several days." AR 742.
- On November 29, 2005, Ms. Sullivan informed Dr. Hejinian that while she had always suffered from mental health symptoms, "for the last decade she has generally been alright." However, "[b]eginning about 6 months ago she began having trouble again," re-triggering her anxiety. She stated she had "episodes of panic feeling a sense of doom wash over her" and was "nauseous all the time." AR 742.
- On December 8, 2005, Ms. Sullivan presented with "anxious depression, becoming more disabling." AR 745. She reported "crying most of the day, feeling nauseous and anxious and unhappy. She continues to have panic attacks and a feeling of impending doom as well as chronic anxiety and hypervigilance." AR 746.
- On January 27, 2006, Ms. Sullivan's anxiety was "worse"; she was having panic attacks "every day." AR 752.
- On February 9, 2006, Ms. Sullivan informed Dr. Hejinian that "the medications don't seem to be working," as she was still suffering "multiple panic attacks during the day," as well as insomnia. Dr. Hejinian continued to diagnose her with "anxiety disorder with prominent panic, depression." AR 751.

(2) Records supporting the SSA award, particularly the conclusions of state agency psychologist Paul Rethinger. Dr. Rethinger noted that plaintiff had a paranoid episode in March 2006. AR 596.

(3) Records of plaintiff's emergency treatment for psychotic symptoms on August 21, 2006, AR 840-43, and again on July 28, 2007 after "walking into the police department with a loaded gun, thinking someone was after her." AR 953, 1122.

(4) Dr. Strek's functional assessment form, dated November 9, 2006, which covered part of the elimination period from May 4, 2006 ("unable to work in a work setting because of instrusive psychiatric symptoms"), and opined that plaintiff could not return to work with accommodations. AR 278-79.

(5) Dr. Nicklin's November 2, 2006 letter reporting that she began treating plaintiff for her mental illness in May 2006. AR 281-82.

14

MetLife's determination that the record provided "insufficient clinical medical evidence" to support restrictions and limitations on plaintiff's ability to work in any occupation during the elimination period (AR 401) is implausible and does not find "support in inferences that may be drawn from the facts in the record." Salomaa, 2011 WL 2040934, *8.

### 2. SSA Disability Determination

The court may also consider MetLife's failure to discuss the SSA's disability determination as to the reasonableness of its denial of benefits. The letter denying plaintiff's appeal mentioned that "the awarding of Social Security Disability benefits does not guarantee the approval or the continuation of Long Term Disability benefits. The [SSA's] determination is separate from and governed by different standards than MetLife's review and determination pursuant to the terms of the Plan." AR 401. During the Social Security Administration's ("SSA") investigation of plaintiff's claim for benefits, psychologist Paul Rethinger, Ph.D., reviewed the evidence and concluded that she had "severe psychological impairments in the nature of an affective disorder (depression/bipolar), an anxiety disorder (post traumatic stress disorder/generalized anxiety disorder/panic disorder), and a substance abuse disorder." AR 596. Neither the denial letter nor Dr. Gosline's report discussed or weighed the findings by the SSA or differentiated those findings from MetLife's determination to deny benefits.

MetLife argues that the SSA determination only made a finding of disability as of July 16, 2006, and is therefore not inconsistent with MetLife's determination that plaintiff was not continuously and totally disabled during the elimination period from November 30, 2005 to June 8, 2006. Doc. no. 33 at 4. As plaintiff explains, however, SSI benefits are not payable until one month after the date of application, so the ALJ had no authority to make a disability finding prior to plaintiff's July 21, 2006 application, which sought SSI benefits for disability beginning June 30, 1989. AR 593, 595. The record does not reflect that the July 21, 2006 eligibility date for SSI benefits was based on a factual determination of commencement of disability. Furthermore, MetLife's argument distinguishing the SSA

15

disability determination on the basis that it covered a different date range is suspect because the denial letter does not indicate that the date range covered by the SSA determination was even considered.

"While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" Montour, 588 F.3d at 635 (citing Glenn v. MetLife, 461, F.3d 660, 674 (6th Cir. 2006), aff'd by Glenn, 554 U.S. 105). "Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied." Id. at 636.

The denial letter does not articulate the difference between the standards used by the SSA and those used by MetLife, nor does the denial letter distinguish the SSA's contrary conclusion and findings. Montour, 588 F.3d at 635. This failure by MetLife to distinguish the ALJ's findings weighs against a finding that MetLife's denial was reasonable.

### 3.     **Structural Conflict of Interest**

MetLife has submitted evidence that in order to ensure the integrity of its claims processing, MetLife's finances are kept separate from claims geographically and organizationally. Declaration of Gregory Hafner (doc. no. 28) ¶¶ 4-10. MetLife represents that its claims determinations are made solely upon the information in the claimant's claim file. Id. ¶ 3. This information is sufficient to show that MetLife has made efforts to mitigate the structural conflict presented by its dual role as payor and claim administrator. This factor does not, therefore, weigh heavily toward a finding of abuse of discretion. The other factors, primarily the weight of the medical records and secondarily the failure to distinguish the SSA's findings, do, however, support a finding that MetLife's denial of LTD benefits was unreasonable.

16

### 4. **Entitlement to Benefits**

MetLife's denial of LTD benefits is not reasonable in light of plaintiff's medical records and evidence of psychological impairment. Based on the evidence presented in the record, MetLife's decision to deny plaintiff long term disability benefits was an abuse of discretion. Plaintiff is therefore entitled to benefits for 24 months under the Plan's provisions governing claims for psychiatric disabilities.

Because MetLife did not make a determination whether plaintiff would be entitled to benefits after 24 months pursuant to the bipolar disorder exception to the Plan's 24-month limitation on LTD benefits, the court remands the matter for determination by the claim administrator. See Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 460 (9th Cir.1996). Within sixty days of the date of this order, plaintiff shall submit to MetLife any additional documents in support of her claim for benefits after the 24-month period. MetLife must make its determination of eligibility for benefits after the 24-month period within sixty days after plaintiff submits such documentation. The court anticipates that any action for judicial review of MetLife's determination of eligibility after the 24-month period would involve an administrative record different from the one reviewed here. The court will therefore enter judgment for plaintiff in the present action without prejudice to filing a new action for judicial review of a subsequent eligibility determination and filing an administrative motion to consider whether the later-filed action should be related to this action. Any motion for attorney's fees incurred in prosecution of this action is due 14 days after entry of judgment.

The parties shall meet and confer on the amount of judgment owed to plaintiff for the 24-month period, including any applicable SSI offset and prejudgment interest. The parties must submit a stipulated judgment, or joint letter brief summarizing the parties' positions on the amount of LTD benefits and any SSI offset, by August 15, 2011.

\\

\\

17

**CONCLUSION**

For the foregoing reasons, defendant's motion for judgment is DENIED and plaintiff's motion for judgment is GRANTED. Judgment shall issue in favor of plaintiff upon determination of the amount of judgment to be awarded to plaintiff.

**IT IS SO ORDERED.**

Dated: July 28, 2011

PHYLLIS J. HAMILTON
United States District Judge